# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Motion to Compel Compliance with Subpoena Directed to the Minnesota Department of Health, | Case No. 19-mc-35 (DWF/BRT) |
| Barbara Pivec, *Trustee for the Next of Kin of Evelyn Schweim, deceased* | **MEMORANDUM OPINION AND ORDER** |
| Plaintiff, | |
| v. | |
| All Temporaries Midwest, Inc.; Francisco Javier Ramirez; The Evangelical Lutheran Good Samaritan Society, *d/b/a Good Samaritan Society-Redwood Falls* | |
| Defendants, | |
| U.S. Department of Health and Human Services | |
| Intervenor. | |

Andrew D. Gross, Esq., Joel E. Smith, Esq., and Kara K. Rahimi, Esq., Kosieradzki Smith Law Firm, counsel for Plaintiff.

Jennifer L. Bullard, Esq., John Lawrence Ackley, Esq., and Michelle Rognlien Gilboe, Esq., Bowman & Brooke LLP; Kate Clarice Johnson, Esq., and Nicole L. Brand, Esq., Meagher & Geer, PLLP, counsel for Defendants.

Pamela Marentette, Assistant United States Attorney, counsel for Intervenor

# INTRODUCTION

This matter before the Court on Intervenor U.S. Department of Health and Human Service's ("DHHS") motion to quash the subpoena issued by Plaintiff Barbara Pivec

("Pivec") on March 8, 2019 to the Minnesota Department of Health. (Doc. No. 13.) For the reasons set forth below, the Court denies the motion.

## BACKGROUND

### I. Facts

Pivec is the trustee and next of kin of Evelyn Schweim ("Schweim"). (Doc. No. 1 ¶ 1 ("Removal").) Schweim was an elderly resident of Good Samaritan Society- Redwood Falls ("Good Samaritan") nursing home who died after suffering injuries while under its care. (*See* Doc. No. 24 ("Pl. Opp.") at 2.) On September 25, 2017, the Minnesota Department of Health ("MDH") conducted a maltreatment investigation concerning allegations of neglect. (Doc. No. 17 ("Krueger Decl.") ¶ 4.) The parties agree that the investigation was conducted pursuant to both federal and state law. (*Id.* ¶¶ 5-6; *see also* Pl. Opp. at 5.)

The investigation consisted of an on-site visit, a document review, and recorded interviews of the other residents, the victim, the alleged perpetrator, and four additional facility employees. (Krueger Decl. ¶¶ 4, 9-11, 15.) Prior to conducting the interviews, the investigator either read or provided copies of a "Tennessen Statement" informing the interviewees of the purpose of the investigation, the right to be interviewed in private, and that the information provided may be used in an investigative report. (*Id.* ¶¶ 16-17, Doc. No. 17-4, Ex. 4 ("Tennessen Statement") at 1.) The Tennessen Statement expressly provided:

> The Minnesota Department of Health's Office of Health Facility Complaints conducts investigations relating to specific matters, frequently regarding Vulnerable Adults, in response to complaints and/or reports of

2

> maltreatment. The purpose of talking with you is to learn information that
> will be useful in helping to make a fair determination about the matter that
> is being investigated. You have a right to be interviewed in private. It is
> the practice of this Office to record all interviews. Information that you
> provide may be used in an investigative report.

(Tennessen Statement at 1.) Notwithstanding, the Tennessen Statement did not warn each interviewee that his or her identity might be produced in lawsuits between private parties. (*See id.*)

The investigation resulted in three separate reports—two state, and one federal. (*See* Marentette Decl. 1 ¶ 4, Doc. No. 2-2, Ex. 2, Pt. 1 at 29-35 ("MN Report 1"), 79-99 ("MN Report 2"); Krueger Decl. ¶ 12, Doc. No. 17-2, Ex. 2 ("Federal Report") at 1-12.)[1] All three reports showed violations or areas of noncompliance. (MN Report 1 at 29, 31; MN Report 2 at 99, Krueger Decl. ¶ 13, Doc. No. 17-3, Ex. 3 ("Federal Summary") at 1- 7.).)

On February 20, 2018, Pivec requested MDH to provide "copies of all the state documents, including uncensored copies of the tapes of witness statements, gathered pursuant to the state investigation." (Doc. No. 18 ("Marentette Decl. 2") ¶ 3, Ex. 1

---

[1] MN Report 1 was produced by the Office of Health Facility Complaints ("OHFC") and summarized findings pursuant to the Minnesota Vulnerable Adults Act., state licensing rules for nursing homes, state statute chapters 144 and 144A, and federal regulations for long-term care facilities. (*See* MN Report 1 at 1.) MN Report 2 appears to be produced by the MDH Licensing and Certification Program and summarized findings pursuant to Minn. Stat. §§ 144.653, 144A.10. As discussed below, the federal report was produced by MDH as a result of an agreement between MDH and DHHS to survey nursing homes to determine whether they are in compliance with the Federal requirements for nursing homes participating in Medicare and Medicaid program.

3

("Request") at 1.) The Request also sought access "to accurate and complete copies of the federal documents gathered pursuant to the federal investigation." (*Id.*)

MDH forwarded the Request to the Centers for Medicare and Medicaid Services ("CMS") which processed the Request under the Freedom of Information Act ("FOIA") pursuant to 5 U.S.C. § 552(b). (Marentette Decl. 2 ¶ 4, Ex. 2.) CMS responded to the Request on May 10, 2018 by producing 137 unredacted pages of records, withholding 45 pages, and redacting 158 pages. (*Id.* ¶ 5, Ex. 3 ("FOIA Response").) The FOIA Response denied access to certain documents pursuant to FOIA exemptions 6 and 7 to protect the identities of facility residents, family members, complainants, state personnel, and facility staff. (*Id.* at 1 (citing 5. U.S.C. §§ 552(b)(6), 552(b)(7)(c).) The FOIA Response advised Pivec that she had a right to appeal if she felt that the withheld information should not be exempt from disclosure. (*Id.* at 2.) Pivec did not appeal.

On July 3, 2018, Pivec filed a wrongful death action in the Fourth Judicial District, Hennepin County District Court, captioned, *Barbara Pivec, Trustee for the Next of Kin of Evelyn Schweim, Deceased v. All Temporaries Midwest, Inc., et al.*, Civ. No. 27-18-0885. (Doc. No. 2 ("Marentette Decl. 1") ¶ 3, Ex. 1.) On March 8, 2019, Pivec served a subpoena on MDH issued by the Hennepin County District Court. (Marentette Decl. 2 ¶ 6, Ex. 4 ("Subpoena").) The Subpoena ordered MDH to produce, among other things, the unredacted transcripts of the interviews, the audio recordings of the interviews, and the identities of the individuals referenced in its investigation. (*Id.*)

On March 20, 2019, MDH informed Pivec that because MDH "investigates alleged violations of law and rules in health care settings for both the state of Minnesota

4

and the Centers for Medicare and Medicaid Services," it forwarded the subpoena to CMS for processing pursuant to the FOIA. (*Id.* ¶ 7, Ex. 5 at 1.) On May 8, 2019, CMS informed Pivec that "after careful review of the document submitted to this office, it has been determined to withhold the materials in their entirety and deny your request due to an incomplete HIPAA compliance authorization."[2] (*Id.* ¶ 8, Ex. 6 at 1 ("Second FOIA Response").) The Second FOIA Response also advised Pivec of her right to appeal the decision. (*Id.* at 2.) On May 14, 2019, Pivec filed a motion to compel against MDH for the subpoenaed records.[3] (Marentette Decl. 1 ¶ 4, Ex. 2.)

On May 20, 2019, the parties stipulated to, and the Honorable Patrick D. Robben approved, DHHS's limited intervention as a right pursuant to Minn. R. 24.01 with respect to the subpoena and motion to compel directed at MDH.[4] (Marentette Decl. 2 ¶ 10, Ex. 8.) DHHS removed the subpoena and motion to compel to this Court on May 31,

---

[2] On May 29, 2019, Pivec sent CMS the proper authorization and again requested the unredacted transcripts of interviews, the audio recordings of the interviews, and the identities of individuals references in the MDH investigative report. (Marentette Decl. 2 ¶ 9, Ex. 7.)

[3] Pivec's motion to compel was also filed in Hennepin County District Court. (Marentette Decl. 1 ¶ 4, Ex. 2.)

[4] Minn. R. 24.01 permits intervention in an action when an applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. *See* Minn. R. 24.01.

5

2019 pursuant to 28 U.S.C. § 1442(a)(1).[5]  (Removal.)  The state court retained jurisdiction with respect to the remainder of the wrongful death suit.  (Marentette Decl. 2 ¶ 11, Ex. 9.)

## II. Statutory and Regulatory Background

The investigation of federally-certified Good Samaritan nursing home was conducted pursuant to both state and federal law.  (Krueger Decl. ¶¶ 4-7.)  The Minnesota Vulnerable Adults Act contains specific instructions and requirements for investigating alleged maltreatment.[6]  *See* Minn. Stat. § 626.557, subd. 12.b.  Federal requirements for participation to receive reimbursement as skilled nursing facilities from Medicare and Medicaid also require periodic surveys.  Title XVIII of the Social Security Act ("SSA"), 42 U.S.C. § 1395, *et seq.*, SSA Title XIX, 42 U.S.C. § 1396, *et seq.*; 42 U.S.C. §§ 1395i-3(b)-(d) & 1396r(b)-(d); 42 C.F.R. Pt. 483, subpt. B; 42 C.F.R. Pt. 488.

To maximize efficiency, Section 1864 of the SSA authorizes DHHS to enter into agreements with state health agencies to survey nursing homes to monitor and certify facilities' compliance with Medicare requirements.  42 U.S.C. § 1395aa.  DHHS and CMS have adopted regulations and guidance establishing detailed requirements for state agencies conducting the survey and certification obligations.  *See, e.g.*, 42 C.F.R. Pt. 488;

---

[5]  28 U.S.C. § 1442(a)(1) permits removal of "a civil action" commenced in state court "that is against or directed to . . . [t]he United States or any agency thereof . . . for or related to any act under color of such office."  28 U.S.C. § 1442(a)(1).

[6]  The State investigation was also conducted pursuant to state licensing requirements for nursing homes and compliance with general health and safety requirements.  *See* Minn. Rules, Ch. 4658; Minn. Stat. Chs. 144, 144a.

6

*see also* State Operations Manual, Appendix P. (Rev. 174, Dec. 8, 2017), http://cms.hhs.gov/manuals/Downloads/som107ap_p_ltcf.pdf. CMS also provides training in the conduct of surveys. 42 U.S.C. § 1395i-3(g)(1)(E).

MDH entered into a Section 1864 agreement with DHHS on June 18, 1985, effective October 1, 1985.[7] (Krueger Decl. ¶ 2, Doc. No. 17-1 Ex. 1 ("Agreement") at 16.) The Agreement provides that the functions to be performed by the state include, "surveying for the purpose of certifying to the [DHHS] Secretary compliance or non-compliance of providers and suppliers of services and resurveying such entities, at such times and manner as the [DHHS] Secretary may direct." (Agreement at 22.) The Agreement further provides that "validation surveys [shall be conducted] on a selected sample basis, or because of substantial allegations of the existence of significant deficiencies." (*Id.* at 23.) Article II(H) of the Agreement further provides that:

> In the performance of the functions described in this Agreement, the State acts on behalf of the [DHHS] Secretary as a Federal contractor, carrying on [ ] the administrative responsibilities imposed pursuant to law by applying and enforcing Federal standards. The Secretary, however, is the real party in interest in administering the program established by the [SSA].

(Agreement at 11.)

Article IX of the Agreement pertains to allowable costs the State may incur in performance of the Agreement:

> If the State utilizes any services or material purchased or contracted for pursuant to this Agreement for purposes other than those authorized by the Agreement, the cost of such services or materials will be pro-rated . . . Only that part that is attributable to the performance of functions authorized by

---

[7] The Agreement was modified on October 1, 1993. (Agreement at 1.)

this Agreement may be considered a reasonable and necessary cost for the performance of this Agreement.

(Agreement at 29-32.)

With respect to privacy, Article XIII(A) of the Agreement requires MDH to:

Adopt policies and procedures to ensure that information contained in its records and obtained from the [DHHS] Secretary or from any provider or supplier of services will be disclosed only as provided in the [SSA] or regulations.

(Agreement at 35.) Article XIII(B) specifies that the information is protected by the Privacy Act of 1974 pursuant to 5 U.S.C. 552a. (*Id.*; *see also* 5 U.S.C. 552a.)

The SSA specifies that no records other than those enumerated in the SSA may be disclosed except pursuant to regulations adopted by DHHS and as otherwise provided by federal law. *See* 42 U.S.C. § 1306(a). The SSA expressly prohibits identification of "individual patients, health care practitioners, or other individuals" in survey reports regarding Medicare and Medicaid providers. 42 U.S.C. § 1306(e)(3). The SSA also provides that public requests for federal survey information are subject to DHHS's FOIA regulations. 42 C.F.R. § 488.325(c); *see* 45 C.F.R. Pt. 5. Further, DHHS's regulations provide that DHHS employees may not testify or produce documents "concerning information acquired in the course of performing official duties or because of the person's official relationship with the Department unless authorized by the Agency head . . ." 45 C.F.R. § 2.3 ("*Touhy* Regulations").

The *Touhy* Regulations also provide that if an employee is served with a subpoena duces tecum, the employee is required to refer the subpoena to the DHHS Office of General Council ("OGC") for a determination of the legal sufficiency of the subpoena,

8

whether the subpoena was properly served, and whether the issuing court has jurisdiction over DHHS. 45 C.F.R. § 2.5(a). If OGC determines that the subpoena was improperly served or the issuing court lacks jurisdiction over DHHS, the subpoena is treated as a request for information pursuant to the FOIA. *Id.*

In 2008, DHHS amended its *Touhy* Regulations to modify the definition of employees falling within its ambit to include state agency employees performing survey, certification, or enforcement functions pursuant to SSA Section 1864 agreements. *See* 73 Fed. Reg. 53148 (Sept. 15, 2008.) Specifically, DHHS now defines "Employees of the Department" as:

> Employees of a contractor, subcontractor, or state agency performing survey, certification, or enforcement functions under title XVIII of the Social Security Act or Section 353 of the Public Health Service Act but only to the extent the requested information was required in the course of performing those functions and regardless of whether documents are also relevant to the state's activities.

45 C.F.R. § 2.2.

## DISCUSSION

DHHS first contends that this Court lacks jurisdiction to compel production of the requested records because Pivec failed to appeal her Request pursuant to the FOIA- effectively foreclosing her only route for judicial review. (DHHS Memo. at 17.) It further contends that even if the Court finds subject matter jurisdiction, disclosure is prohibited by federal and common law privileges, and that disclosure would create an undue burden.

Citing Titles XIII and II(H) of the Agreement, DHHS argues that it is "the real party in interest" and that the State "acts on behalf of the [DHHS] Secretary as a Federal Contractor." (*Id.*) DHHS further contends that survey team members are considered federal employees when engaged in survey activities under federal law, regardless of whether documents are also relevant to the State's activities. (*Id.* at 18.) Accordingly, DHHS argues that the records produced during surveys are federal records for the purposes of DHHS's *Touhy* Regulations. (*Id.*)

Because Pivec did not comply with the *Touhy* Regulations, which requires that subpoenas seeking DHHS records be served on the DHHS OGC, DHHS argues that the subpoena cannot be enforced and must be quashed. (*Id.* at 16.) DHHS further contends that absent a waiver, it is immune from suit because a third party subpoena directed at a federal agency triggers the federal government's sovereign immunity. (*Id.* at 13 (citing *Alltel Commc'ns, LLC v. Dejordy*, 675 F.3d 1100, 1104 (8th Cir. 2012)).) DHHS argues that Pivec's only available waiver was through a proper suit brought under the Administrative Procedure Act ("APA") pursuant to 5 U.S.C. § 702. (*Id.* at 13-14.)

Notwithstanding, DHHS contends that Pivec is barred from seeking APA review because the APA is limited to situations where there is "no other adequate remedy in court," and Pivec had available remedies under the FOIA that she did not use. (*Id.* at 14.) Because the foreclosed APA was the only route for judicial review, DHHS argues that this Court lacks subject matter jurisdiction.

DHHS maintains that even if the Court finds subject matter jurisdiction, release of the subpoenaed information is prohibited by federal law and common law privileges. (*Id.*

10

at 23.) DHHS first argues that the SSA and the Agreement expressly prohibit disclosure of the information demanded in the subpoena. (*Id.*) It also contends that DHHS has a common law privilege to withhold the disclosure of the identities of confidential informants to encourage candid participation without fear of reprisal. (*Id.* at 25-28.)

Finally, DHHS contends that disclosure of the subpoenaed documents would pose an undue burden on MDH and DHHS. DHHS contends that Pivec should have submitted one FOIA request to DHHS, filed one appeal, and one federal court FOIA action if she sought to challenge DHHS's response. (*Id.* at 23 n.7.) DHHS argues that Pivec's challenge in state court has resulted in multiple inefficiencies unnecessarily impacting various state and federal entities. (*Id.*)

Pivec alleges that 28 U.S.C. § 1442(a)(1) does not apply because (1) she sought to compel a Minnesota state agency to disclose data acquired in connection with an enforcement action under the Minnesota Vulnerable Adults Act in accordance with the procedure laid out in the Minnesota Government Data Practices Act ("MGDPA"); and (2) the DHHS lacks the power to preempt state law in this matter.[8] (Pl. Opp. at 6.) Accordingly, she contends that this Court must dismiss the matter for lack of subject-matter jurisdiction because it does not arise under federal law. (*Id.*) She asks the Court

---

[8] The MGDPA sets forth a two-pronged test for courts to determine whether to release data. *See* Minn. Stat. § 13.03, subd. 6. The court must first determine if the information is otherwise discoverable under the rules of evidence and civil procedure. If it is discoverable, the court then determines whether the benefit to the party seeking access to the data outweighs any harm to the confidentiality interests of the entity maintaining the data, any person who has provided the data or who is the subject of the data, or to the privacy interest of an individual identified in the data. *Id.*

to deny DHHS's motion to quash the subpoena and to remand the matter back to the Fourth Judicial District, Hennepin County District Court to determine the enforceability of its subpoena pursuant to state law. (*Id.*)

Pivec argues that pursuant to the Minnesota Vulnerable Adults Act, MDH has a non-discretionary duty to investigate reports of suspected maltreatment of vulnerable adults in accord with specific requirements outlined in the statute. (*Id.* at 7 (citing Minn. Stat. § 626.5557, subd. 1, 12b).) She contends that when MDH investigated Good Samaritan, the MDH issued its own distinct report, as required by state law, which explicitly concluded that the nursing home had violated Minnesota's Vulnerable Adults Act. (*Id.* at 8; *see also* MN Report 1 at 29, 31.) Accordingly, she argues that the data she seeks was created for the state's enforcement of its own state laws and is subject to the MGDPA as opposed to federal disclosure laws. (*Id.* at 8-9.)

Pivec further contends that despite the Agreement, DHS may not preempt application of the MGDPA because: (1) the SSA does not grant DHHS power to preempt state law; (2) even if the SSA did grant DHHS power to preempt state law, DHHS did not exercise the power when it entered the Agreement; and (3) the MDH lacks the authority to enter into an agreement with DHHS that is in violation of Minnesota law. (*Id.* at 11.)

Specifically, Pivec contends that while the SSA requires the State to provide "a process for the receipt and timely review and investigation of allegations of neglect and abuse," it does not discuss whether the records obtained in the process are to be treated as federal or state records. (*Id.* at 12 (citing 42 U.S.C. § 1395i-3(g)(1)(C)).) She contends that the only reference in the SSA regarding records is a list of four kinds of information

12

that each State and the DHHS Secretary shall make available to the public. (*Id.* (citing 42 U.S.C. § 1395i-3(g)(5)(A)).) She argues that because the section of SSA that authorizes the Agreement is silent as to whether State records-privacy laws are preempted, the Court must conclude that the state laws are not preempted. (*Id.* at 12.)

Even if the Court determines that DHHS has the power to preempt state record laws, Pivec argues that the Court should determine that DHHS did not exercise that power when it entered the Agreement because the Agreement only addresses the disclosure of federal documents; not those collected pursuant to a joint investigation. (*Id.* at 14.) Pivec contends that as recently as 2015, the subpoenaed data acquired pursuant to joint investigations was disclosed under state law. (*Id.*)

Pivec relies in part on a 2015 letter from MDH which advised that, "[u]nlike investigations conducted by OHFC, investigations . . . on behalf of CMS do not have a Private Data Identified Key, transcripts of witness interviews, or audio recordings of witness interviews, which you request in your subpoena." (*Id.* at 14 (citing Doc. No. 25 ("Gross Decl.") ¶ 5, Doc. No. 25-1, Ex. 1 at 1 ("2015 Advisement")).) Pivec cites other correspondences with MDH dating back to 2007 which similarly reflect that the subpoenaed data is disclosed pursuant to state law. (*Id.* at 14-17 (citing Gross Decl. ¶¶ 6, 8, 9, Doc. Nos. 25-2, 25-3, 25-5).)

Pivec further contends that the Tennessen Statement, required pursuant to Minn. Stat. § 13.04, specifically advised interviewees it was the practice of the OHFC to record all interviews. Accordingly, she argues that MDH only acquires audio recordings when it is investigating on behalf of state law. (Pivec Opp. at 15-16.) She contends that the

13

federal government has no policy that witness statements must be recorded, and provides no guidance on whether audio recordings of the statements are required or even recommended. (*Id.* at 16-17.)

Pivec argues that the recent decision to treat joint investigation data as federal data three decades after the Agreement makes it unlikely that the original Agreement precluded the state government from complying with state law. (*Id.* at 17.) She contends that the new interference in the State's ability to regulate its health and safety violations and to regulate the data generated therefrom amounts to coercive action by the federal government in violation of the Tenth Amendment. (*Id.*) Specifically, Pivec argues that when MDH contracted with DHHS in 1985, the Agreement allowed for MDH to maintain its records in compliance with the MGDPA; therefore, the State never voluntarily agreed that it would forego its state record laws and replace them with the federal regulatory records program. (*Id.* at 18.)

Pivec next argues that if the Court were to conclude that the Agreement gives DHHS the authority to preempt state record laws and that the agreement does in fact require preemption, the Court must conclude that the MDH lacked the authority to enter into such an agreement with the DHHS's because a state administrative agency lacks the authority to contract in violation of Minnesota Law. (*Id.* at 19-20.) Similarly, Pivec argues that DHHS lacks the authority to promulgate *Touhy* Regulations beyond the scope of its authority. (*Id.* at 20-28.) She contends that the Housekeeping Act pursuant to 5 U.S.C. § 301 which authorizes DHHS' authority to pass *Touhy* Regulations established a clear line prohibiting the DHHS from regulating the conduct of state employees;

14

therefore, the 2008 amendment expanding the scope of its definition of employee to include state contractors is invalid. (*Id.*; *see also* 5 U.S.C. § 301.)

After a careful review of the record and consideration of both parties' submissions, the Court finds that the subpoenaed documents were collected pursuant to state law, and are therefore subject to the MGDPA. Accordingly, the Court denies DHHS's motion to quash the subpoena and remands the matter back to the Hennepin County District Court to determine its enforceability.

While the Agreement clearly contemplates that the State may conduct joint investigations with CMS—as indicated in the provisions related to costs—and expressly provides that data collected pursuant to a federal survey is subject to federal disclosure laws, the Agreement is silent with respect to the disclosure of data resulting from a state investigation that would have occurred with or without a federal survey. While DHHS contends that *all* data pursuant to a joint investigation is subsumed by federal disclosure laws, the Court is unpersuaded. Minnesota had an independent basis and statutory authority to investigate Good Samaritan completely distinct from federal law. *See* Minn. Stat. § 626.557. The Court finds that neither the Agreement nor the SSA do anything to abrogate this authority or preempt it in any way.

Though it may be correct that some overlap exists between that state and federal documents, this does not negate the fact that with or without the Agreement, MDH would have collected the subpoenaed documents on behalf of the State of Minnesota pursuant to the Minnesota Vulnerable Adults Act and any request for disclosure would have been subject to the MGDPA. The Court acknowledges that it is not uncommon for state and

federal agencies to generate investigative reports that reflect violations of both jurisdictions' laws. Notwithstanding, there is a difference between a collaborative investigation, and an investigation conducted for two entirely distinct purposes.

DHHS relies on *Miami Herald Media Co. v. Fla. Dep't of Transp.*, 345 F. Supp. 3d 1349 (N.D. Fla. 2018) to contend that any document relevant to the federal investigation is subject to its disclosure laws. There, the National Transportation Board ("NTSB") used a "party" system to conduct investigations. *Id.* at 1356. Under that system, the NTSB enlisted the assistance of federal, state, or local government agencies to assist in an investigation, but oversaw the investigation and directed the actions of party members. (*Id.*) Here, the SSA and the Agreement control the federal surveys, however they have no authority over the completely independent and distinct investigation pursuant to the Minnesota Vulnerable Adults Act.[9]

Because neither the Agreement nor the SSA specifically define documents exclusive to federal surveys, nor address disclosure of overlapping documents, the Court finds that documents MDH would have collected independently of the Agreement remain subject to the MGDPA.[10] The Court also finds that the Agreement does not preempt the

---

[9] DHHS also cites *U.S. v. Loughner*, 807 F.Supp.2d 828, 834 (D. Ariz. 2011) for the same proposition. There, the court highlighted the federal government's "preeminent involvement in the [joint] investigation. *Id.* at 834. Here, preeminence does not apply; the state's investigation was entirely distinct.

[10] The record reflects that interviewees were specifically advised that MDH was investigating abuse and neglect pursuant to the Minnesota Vulnerable Adults Act, and that interviewees may be recorded. (Tennessen Statement at 1.) Accordingly, the Court finds merit in the argument that the audio recordings are unique to state investigations.

MGDPA in any way. "In all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied [such as the health and safety of its citizens] we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal citations and quotation marks omitted). Here, a clear Congressional intent to preempt state laws is not apparent in either the SSA or the Agreement. The Court declines to infer such intent on as issue traditionally left to States. "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically . . . matter[s] of local concern, the States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Id.* (internal citations and quotation marks omitted).[11]

---

The Court also observes that until 2015, the subpoenaed documents were considered state documents. (*See* Gross Decl. ¶¶ 5-6, 8-9, Doc. Nos. 25-1, 25-2, 25-3, 25-5).)

[11]    DHHS cites *Wetterling, et al. v. Stearns Count, et al.*, Seventh Judicial District, Court File 73-CV-4904 (March 29, 2018) (Doc. No. 28 ¶ 3, Doc. No. 28-1, Ex. 3) to argue that federal law preempts the MGDPA. There, the court found that the release of federal documents in the possession of a state agency was controlled by federal law. (*Id.* at 13.) Because the Court finds that the subpoenaed documents are state documents collected pursuant to state law, the *Wetterling* analysis is inapplicable. In fact, the *Wetterling* parties agreed that the MGDPA governs data collected, received, or maintained by a Minnesota State agency. (*Id.*.) Furthermore, whether or not the MGDPA was designed to incorporate federal law, it is inconsequential because federal law does not apply to the subpoenaed documents.

While this case is analogous to *Liptak v. Cty.*, Civ. No. 16-225, 2016 WL 5662082 (D. Minn. Aug. 24, 2016), there the Magistrate Judge found that the requested records

The Court declines to contravene Minnesota's public policy with respect to vulnerable adults in any way, including its laws with respect to disclosure. "A contrary result would import an entire universe of federal statutory and regulations limiting what may be public or nonpublic into our state statutes when there is no reason to believe that the state legislature, Congress, or federal agencies had this expansive expectation." *Prairie Island Indian Cmty. v. Minn. Dep't of Pub. Safety*, 658 N.W.2d 876 (Minn. Ct. App. 2003). It would also violate the independent sovereignty of the States pursuant to the Tenth Amendment.

Because the Court finds that the subpoenaed documents are not subject to federal law, removal was improper. While DHHS contends that MDH was acting under the Secretary of DHHS pursuant to Section 1864 of the SSA and the corresponding Agreement, this ignores the nature of the joint investigation. Although it is true that MDH was in part acting under the Secretary of DHHS with respect to determining whether Good Samaritan was in compliance with federal regulations, MDH was also acting independently pursuant to the Minnesota Vulnerable Adults Act, and its own licensing requirements. The record reflects that Pivec made two separate demands—one for Minnesota records, and one for federal records. (Request at 1.) While it was proper to process the request for federal records pursuant to the FOIA, the Court finds that her request for the Minnesota records should have been processed pursuant to the MGDPA.

---

were the property of DHHS. Here, the Court respectfully disagrees; because MDH would have collected the subpoenaed documents completely independently of the federal survey, the Court finds that they are state records subject to state laws.

Therefore, when Pivec served the subpoena on a state officer for state documents, removal was improper.

Similarly, DHHS' argument that the investigator was acting as its employee when collecting the data also fails. While it may be true that the investigator was acting as an employee with respect to the federal records, she was also acting as an employee of the state with respect to the state records. Accordingly, the Court finds that any records collected solely for the purpose of the federal investigation would be subject to federal disclosure laws, and any documents collected solely for the purpose of the state investigation would be subject to the MGDPA. Because neither the Agreement nor the SSA define documents exclusive to the federal survey, the Court reiterates that anything MDH would have collected independently of the federal survey remains subject to the MGDPA.

## CONCLUSION

For the reasons set forth above, the court denies DHHS' motion to quash motion the subpoena issued by Pivec on March 8, 2019 to the Minnesota Department of Health. Because the Court finds that the subpoenaed documents were collected pursuant to state law and are subject to the MGDPA, the Court lacks subject-matter jurisdiction. Accordingly, the Court remands the matter to the Fourth Judicial District, Hennepin County District Court to determine the enforceability of the subpoena.

## ORDER

Accordingly, based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Intervenor U.S. Department of Health and Human Service's Motion to Quash Subpoena (Doc. No. [13]) is **DENIED.**

2. This matter is remanded to the Fourth Judicial District, Hennepin County District Court to determine the enforceability of the subpoena.

Dated: October 3, 2019          s/Donovan W. Frank
                                DONOVAN W. FRANK
                                United States District Judge